UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>OMAR DURAN LAGUNES (01) )<br>MARGARITO FUENTES REYES (02) )<br>LUIS OMAR MONTES MERINO (04) )<br>YALITZA EXCLUSA BORRERO (05) )<br>EVELYN RIVERA BORRERO (06) ) | Case No. 3:12-CR-067 JD |

**Opinion and Order**

Following the close of the government's case-in-chief, the defendants have each moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Defendant Luis Omar Montes Merino has filed his motion in writing [DE 224] and the other defendants made their motions orally. Following argument from all defendants and the government, the Court announced that it was denying the motions for reasons to be explained in this order. At the close of all evidence, the defendants each renewed their motions for judgments of acquittal. For the following reasons, the Court denies the motions and renewed motions.

**Standard of Review**

When a defendant moves for judgment of acquittal pursuant to Rule 29, the question the court must ask is whether evidence exists from which any rational trier of fact could find the "essential elements" of the crime beyond a reasonable doubt. *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998); *United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir. 1978) (discussing with approval the Fifth Circuit rule that a motion for judgment of acquittal "must be granted when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to the defendant's guilt, and is such that a reasonably-minded

jury must have a reasonable doubt as to the defendant's guilt.") (citing *United States v. Herbernman*, 583 F.2d 222 (5th Cir. 1978)); *United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973)). The movant "faces a nearly insurmountable hurdle [because courts] consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999), cert. denied, *Fuller v. United States*, 529 U.S. 1138 (2000) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)).

In short, if after viewing the evidence in the light most favorable to the prosecution, the court *does* believe that a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt, the motion must be denied. *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir. 1997). If, on the other hand, the record is devoid of evidence from which a jury could find guilt, the motion must be granted. Fed. R. Crim. P. 29; *United States v. Pulido*, 69 F.3d 192, 205-06 (7th Cir. 1995).

## Analysis

The government has charged the defendants with two conspiracy crimes, both occurring in the Northern District of Indiana and elsewhere. Count 1 charges the defendants with conspiring to commit the immigration offenses of harboring, concealing, or shielding illegal aliens, and encouraging and inducing aliens to enter and reside in the United States. Count 2 alleges that in furthering the conspiracy charged in Count 1, the defendants also conspired to commit mail fraud. To prove each conspiracy charge, the Government must show (1) an agreement to accomplish an illegal objective; (2) one or more overt acts in furtherance of this purpose; and (3) an intent to commit one or more of the substantive offenses. *United States v.*

*Cueto*, 151 F.2d 620, 623 (7th Cir. 1998). "It is not necessary that an overt act be the substantive crime charged in the indictment as the object of the conspiracy. Nor, indeed, need such an act, taken by itself, even be criminal in character. The function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work.'" *United States v. Cudia*, 346 F.2d 227, 228 (7th Cir. 1965) (citing *Braverman v. United States,* 317 U.S. 49, 53 (1942)); *see also United States v. Griggs*, 569 F.3d 341, 344 (7th Cir. 2009) ("[The jury] didn't have to find that the step was itself a crime."). To convict each defendant, the Government must also prove that not only did the conspiracy alleged exist, but that the defendant knew of the conspiracy and intended to join and further the conspiracy's aims. *See United States v.* Navarez, 954 F.2d 1375, 1381 (7th Cir. 1992). "Intent, as well as the agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Cueto*, 151 F.3d 620, 635 (7th Cir. 1998).

The Court notes that based on the evidence discussed below, the Government has shown that both conspiracies occurred within the Northern District of Indiana, as alleged in the Indictment and required for proper venue (which the defendants have not challenged). *See United States v. Rodreguez*, 67 F.3d 1312, 1318 (7th Cir. 1995) (venue rests in any district where an overt act in furtherance of the conspiracy occurred). Here, it is sufficient that Defendant Margarito Fuentes Reyes carried out actions in Elkhart and Goshen, Indiana, on behalf of the conspiracy and by his own account to an undercover agent obtained 200 vehicle registrations and license plates through the mail for customers. There was also testimony that the conspiracy advertised its services in Spanish-language periodicals in the area.

### A. Count I: Conspiracy to Violate Immigration Statutes

Count 1 charges a conspiracy among the defendants (and perhaps others) to accomplish

multiple illegal objectives that violate two subsections of 8 U.S.C. § 1324(a)(1)(A). First, the government charges the defendants with conspiring "to encourage and induce aliens to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence was and would be in violation of law," in violation of § 1324(a)(1)(A)(iv). The government also alleges that the defendants conspired "to conceal, harbor, or shield aliens from detection knowing and in reckless disregard of the fact that an alien had come to, entered, or remained in the United States in violation of law," in violation of § 1324(a)(1)(A)(iii). The government need not prove *both* alleged objects of the conspiracy, notwithstanding the government's use of the conjunctive "and" to link the statutory provisions in the indictment. *See United States v. Cox*, 536 F.3d 723, 726–28 (7th Cir. 2008) (holding that where a conspiracy indictment charges several acts the government may allege the acts in the conjunctive without having to prove all the acts).

As the Court has noted in pretrial orders and the evidence at trial confirms, there is ample evidence of an agreement among the defendants to operate a business, for profit, that would obtain vehicle titles, registrations, and license plates for customers who, due to the lack of social security numbers, could not obtain those items from the Bureau of Motor Vehicles themselves. Evidence in the form of recorded undercover transactions with each of the five defendants demonstrates that Duran-Lagunes ran the business under several names and at several locations, and that the other defendants assisted him in one capacity or another, by meeting with prospective customers, explaining the operation, answering questions, and helping fill out the necessary paperwork. Common phone numbers, business cards, and business practices recovered from business and residential locations in the Indianapolis area and in Elkhart demonstrate that the locations and the defendants were part of a common business enterprise. The testimony of

4

BMV representatives, as well as documents recovered that could have only been created by the BMV, demonstrate that Yalitza Exclusa Borrero and Evelyn Rivera Borrero, along with Omar Duran Lagunes, presented applications to the BMV on behalf of registered business entities that had been created by the conspiracy (specifically by an individual with an e-mail address containing the name Omar Duran, according to records of the Secretary of State) for Duran's customers. This same evidence provides numerous examples of overt acts in furtherance of the conspiracy.

The remaining question is whether the objective of the conspiracy was to violate any of the immigration provisions alleged in Count 1 of the indictment. In other words, did the conspiracy intend to commit one of more of the substantive offenses? *See Cueto*, 151 F.2d at 623. The Court holds that the evidence, taken in the light most favorable to the government, is sufficient to permit a jury to conclude that the objective of the defendants' business was to commit one or more of the immigration offenses alleged in Count 1.

First, at the very least, there is sufficient evidence from which a rational jury could conclude that the purpose of the conspiracy was to help (for a profit) known illegal aliens (based on representations undercover agents made to defendants) to obtain benefits that they could not otherwise legally obtain precisely because of their illegal status, and this evidence is sufficient to demonstrate a purpose of "encourage or induce." *See United States v. Fuji*, 301 F.3d 535, 540 (7th Cir. 2002) (proof that defendant knowingly helped or advised is sufficient to establish the defendant "encouraged or induced"); *United States v. He*, 245 F.3d 953, 959 (7th Cir. 2001) (approving jury instruction equating knowingly helped or advised with "encouraged"). Based on a May 2, 2012 recorded conversation between undercover agent Martin Trevino and Duran-Lagunes, Exclusa-Borrero, and Rivera-Borrero, there is evidence from which a jury could

reasonably conclude that the conspirators understood that the purpose of the business was to obtain titles, registrations, and plates for individuals without legal status and that "everyone that comes here doesn't have papers because they can't go to the BMV." The defendants were correct: the testimony of Giesela Supplee of the BMV demonstrates that there is no way for an individual to title a vehicle or obtain a registration or plates without a valid social security number. And the testimony of David Seymour of the Social Security Administration establishes that illegal aliens, other than in certain very limited situations, cannot receive social security numbers. Even if some undocumented aliens may have found other means to obtain license plates and registrations—like Jaimie Herrera Tabora, who testified that his vehicle had been registered in his brother's name for several years—the fact that assistance similar to that provided by the defendants might also have been available elsewhere does not mean the defendants did not encourage illegal aliens to reside in the United States.

The Court does note that since *He* and *Fuji*, the Third Circuit announced a higher threshold when confronted solely with evidence that the defendant helped or advised an alien to *reside in* the country illegally. *See DelRio-Mocci v. Connolly Properties, Inc.*, 672 F.3d 241, 249 (3d Cir. 2012) (reading 1324(a)(1)(A)(iv) "as prohibiting a person from engaging in an affirmative act that substantially encourages or induces an alien lacking lawful immigration status to come to, enter, or reside in the United States where the undocumented person otherwise might not have done so"). This decision does not affect the result here. First, the Seventh Circuit categorically rejected a similar gloss to the "shielding" prong of the statute in *United States v. Ye*, 588 F.3d 411 (7th Cir. 2009), and the Court finds it unlikely that it would approve the Third Circuit's higher standard in a different provision of the same statute. *See id.* at 416 ("Courts' overlaying the statute with the "tending substantially" veneer appropriates [the executive

6

branch's] discretion and also invades the province of Congress by de-criminalizing lesser forms of conduct—i.e., actions that only "tend slightly or moderately" to help an alien."). Second, even if the Court applied the higher standard from *DelRio-Mocci*, the evidence is still sufficient to permit a jury to find that without the conspiracy's assistance, customers would not have been able to title or register their vehicle, likely substantially limiting their ability to live and work in the United States. *Cf. United States v. Ndiaye*, 434 F.3d 1270 (11th Cir. 2006) (holding that providing false documentation to enable aliens to obtain social security numbers amounts to encouraging under the statute); *United States v. Oloyede*, 982 F.2d 133 (4th Cir. 1992) (upholding conviction for selling false citizenship papers: "While offering [aliens] a chance to stand equally with all other American citizens, defendants encouraged them to continue to reside here").

Furthermore, while there does not appear to be any evidence that the defendants conspired to harbor known illegal aliens as that term is defined in *United States v. Costello*, 666 F.3d 1040, 1048 (7th Cir. 2012)—that is, to provide "a known illegal alien a secure haven, a refuge, a place to stay in which the authorities are unlikely to be seeking him"—the evidence is also sufficient to permit a jury to conclude that an objective of the defendants' scheme was to conceal illegal aliens or shield them from detection. The Seventh Circuit has defined shielding as the use of any means to prevent the detection of illegal aliens in the United States by the government. *Ye*, 588 F.3d at 415 (approving jury instruction defining shield from detection). While the Seventh Circuit has not approved a specific definition of conceal, other Courts of Appeal have, and the Seventh Circuit has noted a substantial overlap between conceal and shield. *See Costello*, 666 F.3d at 1048 (citing *Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir.1928) ("[T]he word 'conceal' should be taken in the simple sense of shielding from observation and

7

preventing discovery of such alien persons.")). A reasonable jury could conclude that the purpose of the conspiracy in this case was to facilitate illegal aliens' ability to evade the attention of law enforcement or other governmental authorities. The fact that the conspiracy obtained license plates and registrations in illegal aliens' own names made it unnecessary for those aliens to seek other, riskier, methods of obtaining registrations and plates, such as forging the items. Indeed, the fact that the defendants, rather than their customers, went to the BMV to title and register the vehicles itself reduced the number of interactions that an undocumented alien needed to have with authorities. Moreover, the fact that the name on the vehicle registration matched an alien's identification made it potentially less likely that police would suspect the alien's lack of status during a routine traffic stop.

Finally, there is no merit to the defendants' argument that a judgment of acquittal is appropriate because there is no evidence that an illegal alien was actually concealed, harbored, or shielded or induced or encouraged. A conspiracy may be established even if its goals were not accomplished because "the crime of conspiracy . . . is complete upon the agreement to do an unlawful act as implemented by one or more overt acts." *United States v. Medine-Garcia*, 918 F.2d 4, 8 (1st Cir. 1990) ("The fact that both aliens were acting as INS informants and neither alien was remaining illegally in the United States at the time of defendant's involvement in this case does not prevent defendant from being prosecuted for conspiracy.").

**B.      Count 2: Conspiracy to Commit Mail Fraud**

"Conspiracy to commit mail fraud requires that the government prove these elements: 1) that the conspiracy to commit mail fraud existed; 2) that the defendant became a member of the conspiracy to commit mail fraud with an intention to further that conspiracy; and 3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy to commit mail

fraud." *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). It must also be reasonably foreseeable that the mails will be used in furtherance of the conspiracy. *Id.* at 943 n.3. Mail fraud involves the use of the mail to carry out a scheme to defraud, which is "any scheme to deprive another of money or property by means of false pretenses, representations, or promises." *United States v. Morris*, 80 F.3d 1151, 1160 (7th Cir. 1996) (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). A scheme to defraud must include the element of a material falsehood, which means that the false statement "has a natural tendency to influence or is capable of influencing the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (internal quotes and marks omitted). To be "in furtherance" of the scheme, "the mailings must be 'sufficiently closely related,' to the illegal scheme that it can be said that they further its accomplishment." *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992) (quoting *United States v. Maze*, 414 U.S. 395, 399 (1974)).

To begin, the Court notes that there is no merit to Mr. Duran Lagunes's argument that the indictment is multiplicitous. As the Seventh Circuit has observed

> Essentially, a claim of multiplicity alleges that separate counts in an indictment charge a single offense. The long-established *Blockburger* test directs our analysis in this regard: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied ... is whether each provision requires proof of an additional fact which the other does not." Applying the *Blockburger* test, we focus on the statutory elements of the charged offenses, not the overlap in the proof offered to establish them, because a single act may violate several statutes without rendering those statutes identical.

*United States v. Muhammad*, 120 F.3d 688, 702-03 (7th Cir. 1997) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932); other citations omitted). The indictment here is not multiplicitous for two reasons. First, the alleged conspiracies violate completely different statutes: Count 1 is alleged in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), whereas Count 2 is

9

alleged in violation of 18 U.S.C. § 1349. Second, the intent of the conspirators with regard to the purpose of each conspiracy is quite distinct. For Count 1, the government must show that the purpose of the conspiracy was to conceal, harbor, shield or induce or encourage illegal aliens; it need not prove that the conspiracy intended to make material misrepresentations to defraud the BMV or the Secretary of State, and it need not prove that it was reasonably foreseeable that the mails would be used in furtherance of the conspiracy. For Count 2, the government must show that the defendants conspired to obtain money or property by means of a scheme to defraud, involving material misrepresentations and the reasonably foreseeable use of the mails; it need not prove that the purpose of this scheme was to induce or encourage any illegal aliens to reside in the country or to conceal or shield any aliens from detection.

     Turning to the elements of Count 2, there is ample evidence upon which the jury could find that a conspiracy to commit mail fraud existed and that at least one conspirator committed an overt act in furtherance of that conspiracy. (The defendants' individual membership in this conspiracy, like the conspiracy alleged in Count 1, will be addressed shortly.) The government has shown that the objective of the conspiracy was to obtain property (vehicle titles, registrations, and license plates) from the BMV based on a series of material misrepresentations, including: (1) that the business entities to whom the BMV issued titles, registrations, and plates were legitimately registered with the Indiana Secretary of State, despite evidence suggesting that the individuals to whom the businesses were registered never personally signed the applications and neither authorized nor had any knowledge that business entities had been created on their behalf, nor that they had any intention of conducting any business activities; (2) that the Power of Attorney forms authorizing defendants Yalitza Exclusa Borrero and Evelyn Rivera Borrero to conduct business on behalf of the individual customers and their business entities were

legitimate forms and properly notarized; (3) that amounts reported in the title applications reflected the actual sales price of the vehicle; and (4) that the vehicles to be titled and registered were properly insured. Some defendants interacting with customers at the point of sale committed overt acts in furtherance of this conspiracy by collecting the necessary identification and information, and some defendants furthered the conspiracy by delivering the fraudulent paperwork to the BMV. There is also ample evidence from which a jury could find that the use of the mail was an essential part of the conspiracy to defraud the BMV because the BMV sent at least some of the property obtained—the permanent metal license plates—through the mail to the conspiracy's customers.

## C. Individual Membership in the Charged Conspiracies

Having concluded that there is sufficient evidence to prove that the conspiracies alleged in Counts 1 and 2 existed, the Court must also determine whether each defendant knew of each conspiracy and intended to join and further its aims. Evidence linking each defendant to the conspiracy must be substantial, but the evidence may be circumstantial. *United States v. Yusufu*, 63 F.3d 505, 508 (7th Cir. 1995). The Court finds sufficient evidence from which a rational juror could link each defendant to both the conspiracy to violate immigration laws and the conspiracy to commit mail fraud.

### 1. Omar Duran Lagunes

The evidence clearly connects Mr. Duran Lagunes to both charged conspiracies. His name was in many respects synonymous with the business and appeared on many of the advertisements and business cards. He rented business locations, signed receipts, and sometimes accompanied other defendants to the BMV to deliver title and registration applications. He was personally present at undercover transactions in the Indianapolis area and in Elkhart, and Mr.

Fuentes Reyes referred to Mr. Duran Lagunes as his boss. Finally, even considering his claim that his knowledge of his customers' illegal status and the ramifications of that fact were not evident from his central role in the conspiracy, he was present on May 2, 2012 when Evelyn Rivera Borrero explained to Agent Trevino that "Everyone that comes here doesn't have papers because they can't go to the BMV." With regard to the mail fraud conspiracy, Mr. Duran Lagunes's involvement with advertising the conspiracy's services, dealing with customers, registering hundreds of business entities with the Indiana Secretary of State on behalf of customers, and delivering applications to the BMV is sufficient evidence to permit a rational jury to conclude that he knew of the conspiracy to defraud the BMV and that he intended to join that conspiracy. He also personally explained to undercover agent Trevino that the BMV would send his permanent license plate through the mail, which demonstrates his knowledge that the conspiracy would involve the use of the mail.

    2.    Margarito Fuentes Reyes

A jury could reasonably infer that Mr. Fuentes Reyes was a member of the conspiracy from the testimony of individuals who did business with him. Officer Contreras testified that he met with Mr. Fuentes Reyes during an undercover operation in which Contreras and his companions were pretending to be illegal aliens and therefore unable to go to the BMV to obtain a title, registration, or license plates. Fuentes Reyes identified Omar Duran as his boss and quoted Contreras a price for a title, registration, and plates. He told Contreras to leave the purchase price and signature on the old title blank and that he did not need insurance to get a license plate. Contreras also testified that he did not sign a Power of Attorney form or any other documents and that no notary was present. When Contreras asked about the fact that the registration was issued to a business, despite the fact that he did not own a business, Fuentes

Reyes assured him that this was fine and advised him how to explain this fact to police if he were stopped, specifically by lying and claiming that he was associated with the very business listed on the registration. At one point he also said the business had done this same thing about 200 times. An undercover agent and cooperating witness obtained business cards bearing Omar Duran's name from the office at which they encountered Fuentes Reyes, and were given a receipt from "Servicios Guerrera," which was the name used by Duran's offices in Indianapolis and also written on receipts issued at those offices.

This evidence is sufficient to demonstrate to a reasonable jury that Fuentes Reyes worked for Omar Duran. Further, there is at least some circumstantial evidence from which a jury might conclude that he believed at least some of his customers were illegal aliens, and that he knew that he was helping them obtain substantial benefits that they could not otherwise get legally. It also demonstrates that Fuentes Reyes was aware of multiple aspects of the fraudulent scheme, including the fact that businesses were created in customers' names (despite the lack of authorization by the customers), and the fact that titles, plates, and registrations were obtained without the provision of accurate purchase price or insurance information. Mr. Fuentes Reyes explained to a confidential informant that his permanent metal plate and registration would be mailed to the address that the informant provided. This—and the fact that over the course of five years, Fuentes Reyes, by his own account, assisted approximately 200 customers to obtain registrations and plates that the BMV would have sent through the mail to the addresses provided by those customers—demonstrates that he was well aware of the fact that the use of the mail was a part of the conspiracy's scheme.

3. Luis Omar Montes Merino

There is also sufficient evidence of Mr. Montes Merino's membership in the conspiracies

charged in both Counts. He was present during undercover operations conducted by Special Agent Martin Trevino, during which Trevino made clear that he did not have legal status and also filled in a blank Power of Attorney form that was later notarized outside of his presence. Montes Merino was also present for the comments of Ms. Rivera Borrero described above, explaining the reason why illegal aliens paid for the conspiracy's services. He personally delivered and explained paperwork to Officer Alma Neuman, who had previously stated that she was from Mexico. During one recorded conversation, he explained to Neuman that the registration and metal plates would come at a later date, though he did not explicitly mention the mail. He was also present during a conversation between Mr. Duran Lagunes, Ms. Evelyn Borrero and Agent Martin Trevino in which Mr. Duran Lagunes explained that everything would be sent by mail. Numerous documents related to the conspiracy were also discovered during a search of Mr. Montes Merino's residence in May 2011 and there were numerous references to Mr. Montes Merino on documents recovered in 2009 and 2011 searches of other locations associated with the conspiracy. Together, this is substantial evidence that Mr. Montes Merino knew of the conspiracy charged in each Count, joined it, and intended to assist known illegal aliens to obtain vehicle titles and registrations in their own names. A jury could also conclude that he intended to obtain property from the BMV by means of a series of material misrepresentations, and that he knew that items would be sent through the mail in the course of the scheme.

    4.     Yalitza Exclusa Borrero

The evidence shows that Ms. Exclusa Borrero was involved with both the intake stage of the conspiracy and the delivery of application paperwork to the BMV. She was present during Officer Neuman's undercover operation, at which time Neuman identified herself as Mexican

14

and also signed a blank Power of Attorney form without a notary present. Testimony of BMV representatives shows that Ms. Exclusa Borrero was one of the conspiracy's two primary agents delivering application and title paperwork to BMV branch locations. When Ms. Exclusa Borrero left the BMV, she had with her title paperwork and temporary paper license plates, but the BMV would mail the permanent plates and registrations directly to customers. From this evidence, a reasonable jury could conclude that Ms. Exclusa Borrero knew that the conspiracy's customers were illegal aliens who could not obtain license plates, titles, or registrations, knew that material misrepresentations were made to obtain these items, and knew that the United States mail was used in furtherance of the scheme. These facts are sufficient to establish her knowledge of and membership in the conspiracies alleged in both Counts.

     5.     Evelyn Rivera Borrero

Finally, the evidence is also sufficient for the jury to link Ms. Rivera Borrero to both conspiracy charges. As already discussed, she was present during intake interviews and clearly expressed her knowledge that the reason customers purchased the conspiracy's services was because they did not have the "papers" to go directly to the BMV, from which a jury could conclude that she was aware that many customers had no legal status. She was personally present when Mr. Duran Lagunes explained to Agent Trevino that his license plate would be sent by mail. Like Ms. Exclusa Borrero, she routinely delivered application packets to BMV branches and was familiar with the process; she also left the BMV each time carrying temporary license plates, with permanent plates to be mailed directly to customers. There is thus ample evidence that she was aware of the conspiracy to commit one or more immigration offenses and to commit mail fraud, and joined the conspiracy with the intent to further its illegal objectives.

For these reasons, the defendants initial motions for judgments of acquittal and their

renewed motions are **DENIED**.

SO ORDERED.

ENTERED:  February 13, 2013

/s/ JON E. DEGUILIO
Judge
United States District Court